```
               UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT CHARLESTON
```

RANDY C. HUFFMAN,
in his official
capacity as Cabinet
Secretary of the
West Virginia Department
of Environmental Protection,
and acting on behalf of the,
STATE OF WEST VIRGINIA

       Plaintiffs,

v.                                 Civil Action No. 2:10-01189

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and
LISA P. JACKSON, in her
official capacity as Administrator,
United States Environmental
Protection Agency, and
UNITED STATES ARMY CORPS OF ENGINEERS and
JOHN M. MCHUGH,
in his official capacity as
Secretary of the Army, and
LIEUTENANT GENERAL ROBERT L. VAN ANTWERP,
in his official capacity as United States
Army Chief of Engineers and Commanding General
of the United States Army Corp of Engineers,

       Defendants

## MEMORANDUM OPINION AND ORDER

Pending are defendants' motion to transfer this action to the United States District Court for the District of Columbia (D.C. District Court) filed October 27, 2010, and a motion to intervene as defendants filed by putative intervenors Sierra Club, West Virginia Highlands Conservancy, Coal River Mountain Watch, Ohio Valley Environmental Coalition, Kentuckians for the

Commonwealth, Southern Appalachian Mountain Stewards, and Statewide Organizing for Community Empowerment filed November 16, 2010.

I.

A. Litigation in the D.C. District Court

On July 20, 2010, the National Mining Association ("NMA"), a mining industry trade association, instituted an action against the defendants in the D.C. District Court ("NMA action"). The complaint casts the NMA action as

> challeng[ing] a series of EPA and Corps actions that have unlawfully obstructed Clean Water Act permitting processes for coal mining. NMA brings this action under Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, seeking review of the June 11, 2009 Enhanced Coordination Process ("EC Process") memoranda . . . and the April 11, 2010 Detailed Guidance Memorandum ("Detailed Guidance") . . . as contrary to the APA, the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 et seq., and other federal law. As explained in the Factual Background section, infra, these memoranda substantially and illegally amend the statutory and regulatory permitting processes for coal mining that form the backbone of coal companies' expectations in planning to extract coal for our nation's power supply, particularly for those companies that require "valley fills" for their coal mining operations.

(D.C. Action Compl. ¶ 2 ("In January 2009, in a marked departure from prior, longstanding EPA practice . . . EPA initiated an

extra-regulatory review process for CWA Section 404 permits that had no basis in the Corps' or EPA's codified procedures."")).[1] NMA alleges that "the EC Process will apply to Section 404 permit applications in six states and three EPA regions in the eastern United States." (Id. ¶ 58).

NMA identifies EPA's "first step" in the EC Process as a screening device for all pending Section 404 permit applications. Those pending applications now number over 200. This screening, referred to as the Multi-Criteria Integrated Resource Assessment ("MCIR Assessment"), sets a threshold of acceptable mining impacts. Application of the MCIR Assessment is designed to generate a list of permits that do not meet the threshold. If the threshold is not met, the further requirements of the EC Process are apparently used for permit review purposes rather than the usual Corps regulatory process.

The NMA action alleges that "EPA's development and use of the MCIR Assessment for evaluating Section 404 permit applications and identifying them for application of EC Process is not embodied or otherwise provided for in any properly

---

[1] Section 404 of the CWA covers discharges of dredged or fill material into the waters of the United States. 33 U.S.C. § 1344(a). The Secretary of the Army is authorized to issue permits for the discharges. Id. The Secretary of the Army has delegated his authority on the matter to the Corps. See 30 C.F.R. § 325.2(a).

promulgated regulation, nor has it been subjected to public notice and comment." (Id. ¶ 63). As of September 11, 2009, EPA had used the MCIR Assessment to screen off 79 coal-related Section 404 permit applications for further scrutiny under the EC Process. The screened permit applications involved mining projects in Ohio, Pennsylvania, Tennessee, Virginia, Kentucky, and West Virginia.

The NMA action asserts 11 claims against defendants as follows:

> Count One: The EC Process constitutes a legislative rule that was not properly promulgated under the APA in violation of section 553[2];
>
> Count Two: The MCIR Assessment offends section 553 for the same reason;
>
> Count Three: The Detailed Guidance offends section 553 for the same reason;
>
> Count Four: The EC Process violates the CWA inasmuch as it is, inter alia, disruptive of the Congressional division of authority between the Corps and EPA in Section 404 permitting decisions;
>
> Count Five: The MCIR Assessment is contrary to the CWA insofar as it attempts, inter alia, to usurp the Corps' exclusive role at the onset of the Section 404 permitting process;
>
> Count Six: The Detailed Guidance is contrary to the CWA inasmuch as it purports to, inter alia, impose an

---

[2]Title 5 U.S.C. § 553(b) and (c) respectively provide for notice of proposed agency rule making and an opportunity to comment. Id.; United States v. Gould, 568 F.3d 459, 476 (4th Cir. 2009).

4

impermissible water quality standard on the states
contrary to both the CWA and EPA's regulatory
interpretation of that statute;

Count Seven: The aforementioned, impermissible water
quality standard, which supposes that in-stream
conductivity levels above 500 microSiemens per
centimeter are likely to be associated with adverse
water quality impacts, constitutes an "impermissible
and irrational administrative presumption[];" (NMA
Compl. ¶ 124).

Count Eight: The Detailed Guidance is contrary to . . .
[the National Environmental Policy Act of 1969
("NEPA")] inasmuch as it purports to establish NEPA
procedures applicable to coal mining without, inter
alia, an opportunity for public review;

Count Nine: The Detailed Guidance is contrary to the
Surface Mining Control and Reclamation Act ("SMCRA")
inasmuch as it lacked public notice and comment prior
to implementation and interferes with SMCRA's grant of
primary regulatory authority to the Office of Surface
Mining ("OSM") and the primacy states[3];

Count Ten: The EC Process, MCIR Assessment, and the
Detailed Guidance are, inter alia, unlawful, arbitrary,
capricious, and an abuse of discretion; and

Count Eleven: The EC Process, MCIR Assessment, and
Detailed Guidance are ultra vires.

Based upon the claims alleged, NMA seeks, inter alia,
(1) a declaration that EPA and the Corps violated the APA in

---

[3]The term "primacy states" refers to those states that are authorized to operate their own surface mining control and reclamation programs. See Ohio River Valley Environmental Coalition, Inc. v. Kempthorne, 473 F.3d 94, 97 (4th Cir. 2006) ("Once the Secretary [of the Interior] approves a state program, the State has achieved 'primacy' and has exclusive jurisdiction to regulate surface coal mining within its borders."); Molinary v. Powell Mountain Coal Co., Inc., 125 F.3d 231, 234 (4th Cir. 1997).

5

issuing and implementing the EC Process, the MCIR Assessment, and the Detailed Guidance; (2) a declaration that those three documents violate federal laws including the CWA, NEPA, and SMCRA; (3) a declaration that EPA has exceeded its statutory authority in the Section 404 permitting process, (4) vacatur of the EC Process, MCIR Assessment, and Detailed Guidance; (5) an injunction prohibiting the enforcement, application, or implementation of the EC Process, MCIR Assessment, and Detailed Guidance; and (6) directions to the Corps to process all pending Section 404 permit applications in accordance with the governing procedures in existence prior to EPA's alleged extra-statutory and regulatory actions. The NMA action was assigned to the Honorable Reggie B. Walton, United States District Judge.

On September 17, 2010, NMA moved for a preliminary injunction. On September 27, 2010, defendants moved to dismiss based upon a variety of grounds. On October 13, 2010, the following putative intervenors sought to join the NMA action as defendants: Sierra Club, West Virginia Highlands Conservancy, Coal River Mountain Watch, Ohio Valley Environmental Coalition, Kentuckians for the Commonwealth, Southern Appalachian Mountain Stewards, and Statewide Organizing for Community Empowerment. NMA opposed the request. On November 8, 2010, Judge Walton granted the intervention request in a brief

6

order, noting that the intervenors had "demonstrated cognizable interests that may be impacted by the outcome of this case, and have shown that these interests will not be adequately protected by the federal defendant[s]." National Mining Assoc. v. Jackson, No. 10-1220, slip op. at 2 (D.D.C. Nov. 8, 2010).

B.   Litigation in the Eastern District of Kentucky

On August 10, 2010, Gorman Company, LLC, Kycoga Company, LLC, Black Gold Sales, Inc., Kentucky Union Company, and Hazard Coal Corporation instituted an action against the same defendants named herein in the Eastern District of Kentucky ("Gorman action").  Defendants moved to transfer the Gorman action to the D.C. District Court for consolidation with the NMA action.  Plaintiffs opposed the request.

On December 9, 2010, the Honorable Gregory F. Van Tatenhove, United States District Judge, stayed the Gorman action, noting it "name[d] the same defendants and challenge[d] the same regulatory" practices as the NMA action.  Gorman Co., LLC v. United States Environ. Protec. Agency, No. 10-228, slip op. at 3 (E.D. Ky. Dec. 9, 2010) ("Indeed, the eleven counts contained in the NMA's complaint and the instant Complaint are identical, and the same relief is sought.").  Judge Tatenhove

held the transfer decision in abeyance pending Judge Walton's disposition of defendants' motion to dismiss the NMA action. Id. at 4 (noting "it makes sense . . . to reserve fully considering and ruling on the Motion to Transfer until after the motion to dismiss in the . . . [NMA] action has been resolved.").

On October 18, 2010, the Kentucky Coal Association ("KCA") instituted an action in the Eastern District of Kentucky against the United States Environmental Protection Agency and its administrator, Lisa P. Jackson, both of whom are named as defendants herein ("KCA action"). That same day the Commonwealth of Kentucky moved to intervene as a plaintiff. On October 20, 2010, the Honorable Amul R. Thapar, United States District Judge, granted intervention. On November 12, 2010, Judge Thapar granted a similar intervention request filed by the City of Pikeville, Kentucky.

On December 6, 2010, Judge Thapar transferred the KCA action to Judge Tatenhove. Noting that the KCA action contained only two counts, Judge Tatenhove nevertheless observed that those claims were the "same or similar" to counts appearing in the eleven-count NMA action. Kentucky Coal Ass'n v. United States Environ. Protec. Agency, No. 10-125, slip op. at 3 (E.D. Ky. Dec. 9, 2010). On December 9, 2010, Judge Tatenhove thus stayed the

KCA action.  Id., slip op. at 4 ("As a result, it makes sense for this Court to reserve fully considering and ruling on the Motion to Transfer . . . until after the motion to dismiss in the D.C. action has been resolved.").

C.   Litigation in the Southern District of West Virginia

On October 6, 2010, plaintiffs, the West Virginia Department of Environmental Protection ("DEP"), and its cabinet secretary, Randy C. Huffman, instituted an action in this court ("DEP action").  It names the same defendants as those found in the NMA action.  An analysis of the complaints in DEP and NMA actions reveal further similarities:

| NMA COMPLAINT | DEP COMPLAINT | COMPARISON |
|---|---|---|
| Count One | Count One | Materially Identical |
| Count Two | No Analogue Count | N/A |
| Count Three | Count Two | Materially Identical |
| Count Four | Count Three | Materially Identical |
| Count Five | No Analogue Count | N/A |
| Count Six | Count Four | Overlapping and Alike |
| Count Seven | Count Five | Overlapping and Alike |
| Count Eight | Count Six | Overlapping and Alike |
| Count Nine | Count Seven | Materially Identical |
| Count Ten | No Analogue Count | N/A |
| Count Eleven | No Analogue Count | N/A |

9

Additionally, the relief sought in the DEP and NMA complaints overlaps almost entirely. (Compare NMA Compl. at 39-40, with DEP Compl. at 50-51).

On October 27, 2010, defendants moved pursuant to 28 U.S.C. § 1404(a) to transfer this action to the D.C. District Court for consolidation with the NMA action. Defendants assert transfer and consolidation is warranted "because all of the complaints challenge the same agency actions, they raise common questions of law and fact, they assert identical claims, and they seek identical relief." (Memo. in Supp. at 2). Defendants note in particular that the DEP action "challenges . . . [efforts] of federal agencies headquartered in the District of Columbia, and challenges documents that were executed in the District of Columbia." (Id. at 3). They also assert that "[v]irtually all of the operative facts alleged in the [DEP] Complaint occurred in the District of Columbia." (Id.)

Plaintiffs oppose the transfer request. They contend that the DEP action challenges not only certain documents promulgated by EPA but also the application of those documents to West Virginia permit requests and programs by EPA and Corps regional offices, with numerous associated meetings and program reviews occurring in Charleston, West Virginia. They also state

that the EC Process and the Detailed Guidance "are only the starting point" for their claims, which they assert are primarily intended to "defend the State's mining regulatory programs and its primary right to interpret its own narrative water quality standard" among other things. (Pls.' Resp. at 3). They additionally assert, <u>inter alia</u>, as follows: (1) plaintiffs are located in Charleston, (2) a substantial part of the property to be mined is found in this district, (3) transfer would prevent a sovereign state from litigating within its own borders a controversy involving its programs, policies, and standards; and (4) plaintiffs' forum choice is entitled to significant weight. Plaintiffs further assert that having to litigate this action in the D.C. District Court "would place an onerous administrative and financial burden on" them. (<u>Id.</u> at 11). They offer no details as to why that is the case.

II.

A.   The Standards Governing a Section 1404(a) Transfer

Section 1404(a) governs the transfer request. It provides pertinently as follows:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any

11

>     civil action to any other district . . . where it might
>     have been brought.

Id.  A section 1404(a) transfer is dependent upon the "weigh[ing] . . . [of] a number of case-specific factors."  Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988). "Factors commonly considered . . . include: (1) ease of access to sources of proof; (2) the convenience of parties and witnesses; (3) the cost of obtaining the attendance of witnesses; (4) the availability of compulsory process; (5) the possibility of a view; (6) the interest in having local controversies decided at home; and (7) the interests of justice."  AFA Enters., Inc. v. American States Ins. Co., 842 F. Supp. 902, 909 (S.D. W. Va. 1994) (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).

     The party requesting transfer shoulders a significant burden.  Id. at 909 (citations omitted).  One reason is that the plaintiff's forum selection is accorded considerable weight. Id.; Collins v. Straight, Inc., 748 F.2d 916, 921 (4th Cir. 1984).  The Supreme Court long ago observed that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  Gilbert, 330 U.S. at 508.

The Supreme Court has, however, suggested at least one tipping factor favoring transfer that would suffice to overcome plaintiff's choice: "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that . . . [§] 1404(a) was designed to prevent." Continental Grain Co. v. The FBL-585, 364 U.S. 19, 25-26 (1960). The rule in Continental Grain has been restated more recently. See also Ferens v. John Deere Co., 494 U.S. 516, 531 (1990) (noting that Supreme Court precedent had "made quite clear" that it is a waste of time, money, and resources to allow two cases with the same issues to pend simultaneously in different districts).

B.  Analysis

Plaintiffs concede that they could have permissibly filed the DEP action in the D.C. District Court. It is thus apparent that transfer is a possibility. Most of the foregoing factors, though, are inapt. The first five are aimed at avoiding, or ameliorating, the time and expense devoted to the discovery and trial processes. Defendants adroitly observe that these five considerations are neutral inasmuch as the judicial

13

inquiry in these cases will be based exclusively on the administrative record. While plaintiffs are unwilling to concede the point, they venture only that "some sort of judicial fact-finding" will be necessary. (Pls.' Memo. in Oppos. at 15 n.8). Their similar prognostication that "there may be other factors justifying extra-record discovery" is equally imprecise. (Id.) The court thus deems the first five factors to be near neutral.

Plaintiffs devote a great deal of discussion to the supposed interest in having local controversies decided at home. For example, their response is littered with references to meetings, comments, and discussions that have taken place in or near Charleston as a part of the regulatory process. The recitation resembles a contacts analysis typically encountered in the personal jurisdiction domain. They also discuss how the challenged memoranda have impacted West Virginia public policies respecting water quality and mining activities.[4]

---

[4] A related contention offered by plaintiffs merits brief mention. They suggest that consolidation of the NMA, Gorman, and KCA actions with this case would be inappropriate because "this case was brought by a State and its administrative agency to defend the State's programs, public policies, and water quality standards, which are unique to the State of West Virginia." (Pls.' Memo. in Oppos. at 17).

As noted, the Commonwealth has successfully intervened in the KCA action. Conceding that fact in a footnote, plaintiffs nevertheless contend that the differences between the DEP action and Commonwealth's intervention complaint would militate against consolidation. As observed further in, even if formal

(continued...)

These assertions are not without some weight but they are unduly restrictive. Irrespective of where the parties have met in the past, or the particular effects that defendants' policies have had in West Virginia, those prosecuting the NMA, Gorman, KCA, and DEP actions have all targeted, inter alia, the Detailed Guidance and EC Process. If those central memoranda are vacated by judicial decree, be it in the D.C. District Court, this court, or some other, their effects on West Virginia's water quality and surface mining policies are practically at an end absent a successful appeal. This factor is thus also properly regarded as neutral, or at least insubstantial.

The weighing process thus resolves to an analysis of the significance of plaintiffs' forum choice as compared to the interests of justice relating in particular to the coordinated disposition of nearly identical litigation pending in different districts.[5] Plaintiffs' forum choice, weighing heavy in the balance, requires no further discussion.

---

[4](...continued)
consolidation is deemed inappropriate, coordinated treatment by a single district judge avoids many of the problems presented by the alternative.

[5]The court recognizes, and has taken into consideration, the fact that the four pending actions are not identical. Given their overwhelming similarities to one another, however, along with the nearly identical relief sought, the Supreme Court's observations in Continental Grain unmistakably apply.

15

There are, however, very substantial considerations in counterbalance. They involve economy, the integrity of the judicial process, and the need for certainty and finality in the coalfields. From an economy standpoint, there is obvious value in having a single district judge superintend the multiple civil actions spawned by defendants' policies. Absent transfer, three judges and their staffs will devote dozens if not hundreds of hours to properly frame the issues, review substantial briefing and arguments at different points, and carefully craft opinions addressing complex subject matter.[6] It bears noting that these multiplicitous proceedings account for work performed only in the district court. Three additional appellate layers are likely to materialize at some point, presenting another undesirable effect discussed further in. Transfer is an easy solution to these unwelcome results.

Regarding the integrity of the judicial process, one would expect the defendants in the three different districts to pursue a unified approach. The same is not as easily said for their plaintiff counterparts. There is no overlap among the respected counsel on the plaintiffs' side, even in the Gorman and

---

[6]This observation is evident in light of the first substantial ruling entered in the four actions. Judge Walton's well-considered and thorough memorandum opinion resolving the motions to dismiss and for a preliminary injunction spans 31 pages.

KCA actions in Kentucky. It seems certain then that all of these different lawyers may pursue differing litigation strategies, perhaps resulting in arguments and authorities being presented to one or some of the district judges but not their judicial counterpart(s). If those variances end up impacting the decisional law, both the judicial process and settled notions of fairness will suffer. That outcome, too, can easily be avoided by transfer.

Third, and of greatest significance for all concerned and the public interest, is the need for certainty and finality in the coalfields. It seems unlikely, but possible, that the NMA, DEP, Gorman, and KCA actions could be decided by the three district judges in the same manner and on the same grounds. The timing of those decisions may differ substantially, however, owing to the filing of the cases at different times, the entry of differing scheduling orders, and the issues in each maturing at their own pace, with procedural issues arising in perhaps some of the cases but not others.[7] Many of these concerns can be alleviated by a single district judge consolidating the cases, or at least coordinating them in some methodical fashion.

---

[7] While defendants moved to dismiss the NMA action and NMA moved for a preliminary injunction, no similar motions have been filed at this time in either this district or in Kentucky.

As noted, the appellate layer poses its own problems if transfer does not occur. For example, the EC Process applies to Section 404 permit applications in six states falling under the jurisdiction of four different United States Courts of Appeal. Assuming compatible results are reached in the district courts where these four actions currently pend, the appellate process offers but one more opportunity for disharmony and differing decisional time lines. It is difficult to comprehend the problems that might arise for the federal and state regulators, the industry, and potentially the citizenry and the markets, if different rules are deemed to apply in different circuits. Once again, transfer eliminates that problem. It offers the best chance for uniformity, certainty, and finality (with dispatch) for these weighty issues impacting the nation's energy supply.[8]

---

[8] It is also worth noting the peculiar expertise in administrative law possessed by both the D.C. District Court and the United States Court of Appeals for the District of Columbia Circuit. See, e.g., Verizon California Inc. v. Peevey, 413 F.3d 1069, 1084 (9th Cir. 2005) (Bea, J., concurring) ("The D.C. Circuit . . . has particular expertise in administrative law . . . ."); Springdale Memorial Hosp. Ass'n, Inc. v. Bowen, 828 F.2d 491, 492 (8th Cir. 1987) (Heaney, Lay, and McMillian, JJ., dissenting from the denial of a pet. for reh'g en banc) (noting the apparent benefit of "call[ing] upon the expertise of the District of Columbia Circuit to provide decisions in cases in administrative law which, unless reversed by the Supreme Court, are expected to have a national impact."); Seema Shah and Patricia Zettler, From a Constitutional Right to a Policy of Exceptions: Abigail Alliance and the Future of Access to Experimental Therapy, 10 Yale J. Health Pol'y, L. & Ethics 135, 139 (2010) ("The D.C. Circuit is widely recognized as having special expertise on matters of administrative law, and the Abigail Alliance opinion is now considered an authoritative
(continued...)

Based upon the foregoing, the considerable weight of plaintiffs' forum choice cannot withstand the confluence of negative effects likely to result from the DEP action remaining in this district. The balance is thus struck strongly in favor of the defendants' request to transfer. Gilbert, 330 U.S. at 508.

The court, accordingly, ORDERS that defendants' motion to transfer be, and it hereby is, granted. It is further ORDERED that this action be, and it hereby is, transferred to the District of Columbia District Court for all further proceedings.

The court additionally does not reach the motion to intervene, deeming it best for that determination to be made in the transferee court. For example, Judge Walton has previously imposed joint filing conditions upon those parties to whom he has granted intervention.

---

[8](...continued)
judgment on the topic of a constitutional right to access experimental therapies."). This observation fortifies the potential for certainty and finality that seems so critical for all concerned.

The Clerk is requested to transmit this written opinion and order to all counsel of record and to any unrepresented parties.

DATED: January 31, 2011

John T. Copenhaver, Jr.
United States District Judge